Laramore, Judge,
concurring:
I concur in the result reached by both the opinion of the majority and the opinion of the commissioner. However, I disagree with the majority opinion wherein it is held that only 136 cartons were in the trailer at the time of the accident.
The commissioner who presided at the trial was in a position to judge the demeanor and credibility of the witnesses and the weight to be given their testimony. In spite of the fact that plaintiff’s claim agent and an assistant testified that 26 cartons were in a “follow lot” shipment, the com *5 missioner apparently has rejected this evidence in favor of the documentary evidence. In other words, the manifest showed 162 cartons loaded; the plaintiff’s claim agent the day after the accident sent a letter specifically stating that “136 cartons showed water damage”; the road manifest showed a recording by one of plaintiff’s agents made at the scene of the accident, that 136 cartons were unloaded, which coincides with the number of water-damaged cartons reported by plaintiff’s agent. As between a witness’ memory and documents prepared at or near the time of the accident, the commissioner was, in my opinion, wholly justified in relying upon the contemporaneous documents. Furthermore, assuming that 136 cartons were water damaged in the accident, it would be entirely inconsistent for plaintiff now to say that 84 of the cartons were dry.
For these reasons, I would adopt the report of the commissioner in respect to the number of cartons present in the trailer at the time of the accident.
OPINION OP THE COMMISSIONER
This case arises out of damage to a shipment of Government freight while being transported by plaintiff, a motor common carrier. The Government claims it incurred a loss and suffered damages totaling $9,907.87 as a result of plaintiff’s delivery of the freight in a defective condition. Upon plaintiff’s refusal to accept liability in such amount, the Government deducted that sum from amounts concededly due plaintiff on other shipments about which there is no dispute. Plaintiff admits it caused damage to the freight for which it is responsible, but contends its liability amounts only to the sum of $3,180.32. It argues that any damage exceeding that amount which defendant suffered was due to defendant’s own negligent handling of the freight after plaintiff delivered it to defendant, as well as to the performance of unnecessary services in rehabilitating the freight so as to put it into serviceable condition. It therefore sues to recover $6,727.55, which is the difference between said two figures.
At its .terminal in Chicago, Illinois, plaintiff received from a connecting carrier a shipment consisting of 162 *6 cardboard cartons and wirebound wooden boxes (said cartons and boxes being hereinafter sometimes collectively referred to as cartons) for delivery to the Brookley Air Force Base at Brooldey, Alabama, which is located near Mobile, Alabama. The cartons contained airplane landing gears, brake assemblies and brake parts, which were manufactured and being shipped by the Bendix Products Division of the Bendix Aviation Corporation, located at South Bend, Indiana.
Proceeding from Chicago, plaintiff’s tractor-trailer unit carrying the shipment (as well as some non-Government freight) met with an accident near Coldwater, Mississippi. It was forced off the highway and into a drainage ditch, where it lay on its right side. As a result of heavy recent rains in the area, there was water in the ditch, and the entire right side of the trailer rested in the water to the extent of approximately 20 inches at the rear and approximately 12 inches at the front end, the trailer lying at an angle of approximately 35 degrees. Water entered the trailer and wet part of the freight, including the Bendix shipment herein involved.
The trailer remained in the water approximately 3 hours, when it was pulled from the ditch and unloaded by plaintiff’s employees who had come to the scene of the accident from Plaintiff’s home office at Memphis, Tennessee, a distance of approximately 30 miles. Two other trailers were brought to the scene from Memphis, and the freight from the overturned trailer was then unloaded. Freight which was considered to be dry was placed in one trailer while wet freight was placed in the other. The two trailers then returned to Memphis where the wet and dry freight were unloaded and kept segregated at plaintiff’s terminal.
Since the accident occurred on a Saturday, when it was not possible to contact Bendix, to whom plaintiff contemplated returning the shipment, the cartons remained in this condition until the following Monday, when plaintiff’s general claim agent telephoned Bendix, advised it of the accident and sought instructions. Plowever, Bendix advised that because the shipment was moving on a Government bill of lading and title had passed to the Government, Ben *7 dix could not accept its return. Thereupon, plaintiff’s claim agent telephoned the Brookley Air Force Base and advised it of the accident and the information received from Bendix. Brookley confirmed that since the shipment was moving on a Government bill of lading, it would have to be sent on to the Base.
Thereupon, plaintiff loaded the shipment herein involved, consisting of all 162 cartons, both wet and dry, in a trailer and sent it on from Memphis to Mobile. The dry cartons were loaded in the front end (the nose) of the trailer, and the wet in the rear. Between the two was loaded some non-Government freight. Heavy cardboard sheets, acting as separators or partitions, were placed between the freight sections to aid in protecting the dry cartons from water that might come from the wet.
The run from Memphis to Mobile is a 899-mile 15-hour one by tractor-trailer. It left Memphis Monday night and arrived at plaintiff’s Mobile terminal the following day where, after some local city freight was unloaded, it was sent on to the Base. It was unloaded by the Base Tuesday night, shortly after its arrival. After inspection, defendant subsequently ran functional tests on the contents of all 162 cartons. Twelve brake assemblies, which arrived in dry cartons and showed no evidence of exposure to water, were not given any further treatment. Of the remaining 150, 36 assemblies were damaged beyond economical repair and were condemned. The balance of 114, which showed some evidence of rust or corrosion, were completely disassembled and processed to make certain that all rust and corrosion were removed, and then given corrosion protective treatment. After crediting plaintiff with the salvage value of the condemned assemblies, the balance of the loss on such assemblies, plus the cost of labor and materials on the 114 treated and processed ones, came to $9,907.87. No charges were assessed with respect to the contents of the 12 dry cartons.
In contesting this $9,907.87 charge against it, which admittedly had its genesis in the accident in which its truck was involved and for which it must necessarily accept responsibility, plaintiff makes numerous contentions. After a careful examination and analysis of them, as hereinafter set forth, the conclusion is compelled that they must be rejected *8 and that plaintiff is liable for the full amount of the charge.
Plaintiff first contends that, as a result of the accident and the water entering the trailer, only 52 cartons became wet. It claims that 26 of the 162 cartons and boxes involved in this shipment were not even on the trailer, since these 26 came from Chicago as a part lot in another trailer. It thus says that only 136 cartons were on the overturned trailer and that, as it removed the freight from such trailer and segregated the wet cartons from the dry, it carefully counted them and determined that 84 were not touched by the water. As to the remaining 52 cartons, which it concedes became wet, it accepts liability, but argues its liability can go no further because when it reloaded the full shipment of 162 cartons on the trailer at Memphis (the 26-carton part lot having arrived from Chicago in the meantime) it carefully segregated, in the nose of the trailer, the 26 cartons that had not been in the accident, then loaded some other non-Government freight, then again carefully segregated the 84 cartons that had been in the accident but emerged dry, then loaded other non-Government freight, and then loaded the 52 wet cartons in the rear, segregating and protecting each section of freight by heavy cardboard sheets, which acted as separators or partitions. It says that tins manner of loading would result in only the 52 cartons at the rear arriving at the Base wet, and had defendant’s unloaders carefully unloaded and kept the wet cartons segregated from the dry, in the same manner in which plaintiff had loaded the trailer at Memphis, defendant would have had to perform repair services only on such 52 cartons. It contends that because of the extreme importance of care being exercised in the unloading, its general claim agent specifically arranged with defendant’s responsible official, in the aforesaid telephone conversation with the Base advising of the accident, that the truck not be unloaded upon arrival at the Base until plaintiff’s local Mobile representatives could come to the Base and supervise the unloading in accordance with the aforesaid loading plan, and that defendant’s official specifically so agreed, but that in violation of this agreement, defendant’s employees proceeded to unload the trailer prior to the arrival of plaintiff’s representatives. It is further argued that defendant’s employees accomplished the unload *9 ing so negligently that the wet cartons were all intermingled with the dry, causing the latter also to become wet. It says that if it were in fact necessary to process and treat the large number of assemblies which defendant did, it was therefore due to the negligence of defendant’s own employees. But it further argues that it was, in any event, not necessary for defendant to go to the extent it did in treating, processing, and protecting the 114 assemblies and then charging the cost thereof to plaintiff. It contends the shipment was not in such wet condition as to warrant the extent of the services performed.
Plaintiff does not contest the reasonableness of the labor, materials and other charges making up the $9,907.87 assessment against it. On the 162 cartons, the average cost would thus come to $61.16 per carton, which plaintiff accepts as a basis for the measure of its liability. With respect to the 52 cartons which it admits became wet in the accident, it thus admits liability in the sum of $8,180.32 (52 X $61.16).
The contention that 26 cartons were not even on the trailer that was in the accident and therefore could not have become wet cannot be accepted in the face of a contemporaneous record prepared by plaintiff’s own organization specifically showing the entire 162 cartons as being on the trailer. This document, called a “road manifest,” was prepared by plaintiff’s agent at Chicago, its specific purpose being to show what freight was on the trailer, including the number of pieces comprising the shipment of each shipper, and the weight of the shipment.
As to another shipper’s freight on the same trailer, the manifest plainly shows that it consisted only of a part lot and that the balance of the shipment was on another trailer. No such notation appears on the manifest with respect to the Bendix shipment. This document compels a finding that all 162 cartons were on the trailer involved in the accident.[1]
*10 The contention that only 52 of the 162 cartons became wet also lacks any support by way of contemporaneous records, is, on the other hand, similarly rebutted by such records, and therefore likewise cannot be accepted. As stated, plaintiff’s agents were at the scene of the accident shortly after it occurred and supervised and assisted in the unloading of the freight into the two other trailers. The accident occurred on Saturday, February 11,1956. On Monday, February 13, the segregated wet and dry cartons were loaded on the new trailer at Memphis. On Thursday, February 16, plaintiff’s claim agent, who had been at the accident scene and participated in the unloading operation, was at the Base and was asked by defendant to furnish a report concerning the accident and the wet freight. The following day, Friday, February TT, the agent sent a letter specifically stating that “136 cartons showed water damage.” Presumably the entire matter was fresh in his mind at that time. On the other hand, no contemporaneous record shows any such figure as 52 (wet cartons) or 84 (dry cartons) as plaintiff now claims. Furthermore, the aforesaid road manifest, on which there was recorded by one of plaintiff’s agents at the scene of the accident a count with respect to the unloaded freight, contains 136 marks, which coincides with the aforesaid figure shortly thereafter set forth in plaintiff’s letter concerning the number of wet cartons. Under these circumstances, it is not possible to find that only 52 cartons became water damaged as a result of the accident.[2] The first time any such figure was mentioned was in a compromise letter to defendant written some 8 months later (October 16,1956) shortly after plaintiff was formally advised of the amount of the charge that would be made against it. The figure contained in that letter written under such circumstances and so long after the event certainly cannot be accepted over the contempo *11 raneous data contained both in the letter of February 17[3] and on the road manifest.[4]
In any event, even accepting plaintiff’s contentions that 26 of the cartons were not on the overturned trailer and only 62 that were on it became water damaged, plaintiff would still be in no essentially better position. This is so because, after the accident, plaintiff completed the transportation from Memphis to Mobile by reloading the wet cartons, and the other wet non-Government freight, with the dry freight, all in the same trailer. That it is not good practice to transport wet and dry freight in the same truck was frankly conceded by plaintiff. What there was to be gained by so carefully segregating the wet and dry freight in two separate trailers immediately after the accident, and keeping them so segregated in plaintiff’s Memphis terminal, and then putting them all together in the same trailer for the Memphis-Mobile run, so the water from the wet freight could cause damage to the dry, is not understood. At the trial plaintiff’s agent explained that he foresaw the possibility of the dry freight becoming wet by being transported in the same trailer and inquired about forwarding the wet freight to Mobile in a separate trailer, as he had done in transporting the wet freight from the scene of the accident *12 to plaintiff’s Memphis terminal, but the department in plaintiff’s organization that was in charge of such matters concluded it would be uneconomical to send two unfilled trailers all the way to Mobile. The economics of the situation and the risks of proceeding in the fashion in which it did were, of course, matters for plaintiff itself to weigh and decide, but it must necessarily be prepared to assume the consequences thereof. The evidence is overwhelming that when the trailer arrived at the Base, the entire shipment was in a very wet condition. Accordingly, regardless of how many cartons were on the overturned trailer, or the number of cartons that became water damaged as a result of the accident, the evidence is clear that by the time the new trailer, which concededly carried the entire 162 cartons, both wet and dry, arrived in Mobile, the shipment had become further damaged, and that this too was plaintiff’s responsibility.
Plaintiff emphasizes the maimer in which it loaded the trailer at Memphis, carefully segregating the wet and dry freight, as described above, and points out that the trailer’s front fifth wheel causes it to slope from the nose to the rear, so that any water from the wet freight in the rear could not move forward and damage the dry freight in the other sections. The entire arrangement would insure, plaintiff argues, the freight’s arriving in Mobile in the same condition as it was loaded in Memphis. However, even assuming such careful loading in accordance with such a plan,[5] plaintiff admits that the cardboard separators were not waterproof and that water could get around them. Furthermore, parts of the terrain on the 399-mile 15-hour run from Memphis to Mobile is hilly, so that water could be thrown forward on the downgrades, as well as on ordinary stops and starts. The very fact of plaintiff’s admission that it is poor practice to ship dry and wet freight together in the same truck rebuts plaintiff’s contentions.
Nor can plaintiff’s assertion that it had a specific agreement with defendant that the trailer would not be unloaded *13 at the Base until the arrival of plaintiff’s Mobile agents be accepted. Plaintiff says this agreement was made during the above-mentioned telephone conversation between plaintiff’s claim agent and a Base official on the Monday morning following the accident and immediately after said agent’s conversation with Bendix. No written mention of any such alleged agreement or complaint about its alleged violation by defendant was made by plaintiff at the time. The aforementioned letter plaintiff wrote to defendant on February 17, 1956, or some other letter of protest or complaint written about the time of the alleged violation of the agreement, would have logically been the time or occasion to have referred to such an agreement. Even the aforesaid compromise letter of October 16,1956, sent after the charge against plaintiff was made refers to no such specific agreement on this shipment. It merely says “* * * it was agreed that we should bring the damaged merchandise to the Brookley Air Force Base for inspection.” [Italics supplied.] The letter then goes on to rely on a general procedure of the Base concerning damaged merchandise, and plaintiff’s interpretation of how it applied to the instant situation, but this general procedure can not support an alleged specific agreement made over the telephone. Actually plaintiff, by its own admission, was originally not greatly concerned over its liability, since it appears that when its claim agent telephoned Bendix on said Monday morning to advise of the accident, the agent overheard a conversation between Bendix employees which led him to believe that exposure of the brake assemblies to fresh water would not cause harm to the brakes. Plaintiff thereupon concluded that its liability would amount only to the relatively inconsequential cost of repackaging. This lack of concern as to its liability is not consistent with the alleged special arrangement whereby unloading was not to take place unless supervised by plaintiff’s Mobile agents and does, instead, lend credence to defendant’s testimony that in said telephone conversation, the primary purpose of which concerned where the shipment should be sent, plaintiff specifically authorized the Base to unload and protect the shipment and then to hold it pending plaintiff’s inspection. This is exactly what the Base did — it promptly unloaded the *14 shipment upon its arrival Tuesday night, placed it on pallets so the water could drain off, segregated it in the receiving warehouse, and held it there for inspection by plaintiff’s Mobile agents. Indeed, considering the wet condition of the truck upon its arrival Tuesday night, with water falling from it and dripping from the cartons, it would have been most unusual indeed to have let it remain in that state overnight and until plaintiff’s agents could arrive the next morning. It was entirely logical for plaintiff’s Memphis agent to have wanted the truck to be unloaded as soon as possible, knowing, as he did, of the possibility of the dry freight becoming wet on the journey from Memphis. In view of all these considerations, the finding is compelled that plaintiff’s Memphis agent in fact authorized defendant’s officials at the Base to unload the truck and retain and protect the shipment in defendant’s warehouse for plaintiff’s later inspection, which defendant did.
In further support of its alleged agreement contention, plaintiff points to a so-called arrangement or understanding it had with the Base, arising from other deliveries it had made, to the effect that when any freight damage was discovered during the course of unloading one of its shipments, unloading would be suspended until plaintiff’s agents could be notified and could, if they so desired, come to the Base to inspect the damage and supervise the further unloading. This general procedure is in fact the only “agreement” upon which plaintiff relied in its letter of October 16, 1956, as set forth above. However, this arrangement or understanding did not amount to any special agreement with plaintiff. It was the general policy and procedure of the Base and applied to all carriers upon the discovery of any damage during the course of unloading. Indeed, reliance upon this general practice and procedure illustrates its inapplicability to the instant situation, for its primary purpose was to give carriers immediate notice of the discovery of concealed damage. But here the carrier already had notice of the damage and, indeed, it was the one who first notified defendant thereof.[6]
*15 As stated, pursuant to the arrangement plaintiff’s Memphis agent made with the Base, the shipment was unloaded, segregated, and held for plaintiff’s inspection, which was conducted the following morning, Wednesday, by plaintiff’s Mobile claim agent, and also on Thursday by plaintiff’s general claim agent himself, who had immediately come to Mobile after being advised by the Base that the damage could amount to thousands of dollars. It would seem that at that time a prompt protest in writing could have been made had defendant violated any such agreement as plaintiff relies upon, for by that time plaintiff had been advised that the claim against it might well be a sizable one. But none was made and indeed, as set forth above, in the letter plaintiff wrote the very next day with respect to the matter*, no mention was made of any such alleged agreement or violation thereof by defendant.
In light of the above considerations, plaintiff’s contention that all but a dozen of the cartons were wet due to defendant’s unloaders’ negligent handling of the cartons and their stacking the wet cartons together with the dry, cannot be sustained. Instead, it seems clear that 136 cartons became wet in the accident, as plaintiff itself said in its letter written shortly after the accident, and that approximately half of the remaining 26 dry cartons further became wet en route from Memphis to Mobile. This would leave approximately 12 dry cartons and plaintiff was not in fact assessed any charges with respect to 12 cartons. If the trailer was loaded as plaintiff contends, with the wet cartons in the rear and the dry cartons in the nose, the latter would be the last to be unloaded and would have been segregated in the ordinary course. The testimony shows that defendant’s un-loaders did in fact segregate the few cartons that were dry, as the natural sequence of unloading would, as stated, have caused them to do in any event.
Finally, plaintiff denies the cartons were as wet as defendant claims them to have been and that the amount of processing and treating to which defendant subjected them was unnecessary. The evidence as to the extremely wet condition of the cartons upon their arrival at the Base is overwhelming and convincing. Water was dripping from the *16 cartons and from the truck itself. Some of the cartons had deteriorated and the brake parts in them were visible. Water was running out of the wooden crates. Almost all of them showed some water stains and damage. After their removal from the truck and placement upon pallets in the warehouse, pools of water became visible on the warehouse floor. Defendant’s employee who handled the unloading on Tuesday night noted on the bill of lading that “This shipment was received at Brookley AFB [Air Force Base] in a very wet condition. Subject to inspection for damage.” And the following morning, after plaintiff’s duly authorized Mobile claim agent inspected the shipment, he endorsed on the bill and under the above notation: “Carrier agent acknowledges above discrepancy.” Under these circumstances and with this admission, it is not understood how plaintiff can seriously maintain that the shipment was not received in an unusually wet condition.
For the same reason, plaintiff’s contention that defendant went to undue lengths, and performed unnecessary services in treating and processing the assemblies, must be rejected. The acknowledged “very wet” condition in which the shipment was received necessarily rebuts the contention that the brakes did not require extensive reconditioning. The very witness upon whom plaintiff relies (a Bendix engineer) and who testified that under certain circumstances of cartons containing brake assemblies being exposed to water, it would be proper to make only a spot check of a few brake assemblies instead of disassembling and processing 150 cartons, as defendant did, further testified that the Air Force’s “approach” to the problem was a “conceivable” one and an approach with which he could not quarrel. This witness did not, of course, see the actual condition of the shipment when it arrived at the Base, but, as an expert, was testifying only on the basis of hypothetical questions. Plaintiff naturally does not complain about the 12 cartons for which no charges were made against it, nor does it appear to contest the condemning of the 36 assemblies as being beyond economical repair, or the amount of salvage value on the parts thereof, with which it was credited. This leaves the 114 assemblies which defendant completely disassembled, *17 processed to remove all rust and corrosion, and applied protective anticorrosion treatment, the labor and material costs of which were charged to plaintiff. As to these 114, the evidence shows that the decision to so process them was based, after careful inspections, upon the existence of visible rust or corrosion thereon. On the aforementioned 12 assemblies, no rust or corrosion was visible and they were given only the functional test, for which no charge was made against plaintiff. Nor were the costs of any inspections charged against plaintiff. Contrary to the impression plaintiff’s claim agent received on overhearing, during his telephone call to Bendix, a conversation between Bendix employees, exposure of these assemblies to impure fresh water would cause corrosion on their metal parts. A major assembly of the brake consists of magnesium parts, a metal peculiarly susceptible to corrosion. These brake assemblies are delicate and important aircraft parts upon the proper functioning of which depend the lives of the passengers and crew. The record indicates no justifiable cause for any complaint by plaintiff as to the extent of the work performed by the Base in putting these assemblies into serviceable condition.
As a result of a detailed consideration of all the facts and circumstances herein involved, it is clear that the damage to the brake assemblies was due to the accident in which one of plaintiff’s trailers was involved and in which some freight became wet, and the subsequent aggravation thereof by plaintiff’s forwarding of the wet and dry freight together in another trailer. As a common carrier, plaintiff is, of course, “liable as an insurer under the carrier’s contract to carry safely.” Atchison, Topeka and Santa Fe Railway v. United States, 118 Ct. Cl. 194, 200. The burden of proving that the loss and damage was in fact due to the consignee’s fault, which constitutes an exception to such common carrier liability, is cast upon the carrier. Atchison, Topeka and Santa Fe Ry. v. United States, supra; Lever Bros. Co. v. Baltimore & Ohio R. Co., 164 F. (2d) 738, 739 (Ct. App. 4th); Lehigh Valley R. Co. v. State of Russia, 21 F. (2d) 396, 405 (C.C.A. 2d). In this case plaintiff has *18 failed to carry such burden. It is therefore recommended that the petition be dismissed.
FINDINGS OK KAOT
1. Plaintiff is a corporation organized and existing under the laws of the State of Tennessee, with its principal office and place of business located in Memphis, Tennessee. It now is and was, during all times hereinafter mentioned, engaged as a common carrier by motor vehicle in the transportation of property for hire in interstate commerce by authority of the Interstate Commerce Commission.
2. On February 7, 1956, the Bendix Products Division of Bendix Aviation Corporation (hereinafter referred to as Bendix), located in South Bend, Indiana, tendered to Tucker Freight Lines, a motor carrier, a shipment of freight consisting of 162 cartons and boxes of airplane landing gears, and airplane brakes or parts, to be forwarded from South Bend, Indiana, to the Transportation Officer, Brookley Air Force Base, Brookley (near Mobile), Alabama. The shipment moved on Government bill of lading No. AF-5879721, and was routed via Tucker Freight Lines as the initial carrier, and plaintiff. Most of the containers consisted of cardboard cartons, but some consisted of thin wooden wirebound crates.
3. On February 9,1956, Tucker Freight Lines, the originating carrier, after transporting the shipment to Chicago, Illinois, transferred the shipment to plaintiff in Chicago for further movement to Brookley, Alabama. As is shown by a so-called “road manifest” (No. 886, dated February 9, 1956), which was prepared by plaintiff’s agent at Chicago for the purpose of recording the freight loaded on the motor vehicle, as well as by plaintiff’s freight bill (No. CH-362214, also dated February 9,1956), the 162 cartons were scheduled to be loaded in plaintiff’s trailer designated as “Trailer V-534.” There was also loaded on the trailer other shipments of non-Government property and because of weight restrictions and limited space, plaintiff’s agents were able to load only 136 of the cartons on this trailer, which was loaded to its full visable capacity. The remaining 26 cartons were loaded on another of plaintiff’s trailers as a “follow lot” shipment. This, however, was not noted on the road manifest.
*19 4. At approximately 4 o’clock in the morning of Saturday, February 11, 1956, Trailer V-534 (together with the tractor hauling it) met with an accident and was forced off the highway. The accident occurred on U.S. Highway 51, approximately 2 miles north of Coldwater, Mississippi, and 30 miles south of Memphis, Tennessee. As a result, the trailer went off the highway into a drainage ditch, where it lay on its right side, leaning at an angle of approximately 35 degrees. Heavy rains had occurred in the area for a couple of days previously. As it lay in the ditch, the trailer was in approximately 20 inches of water at the rear and approximately 12 inches at the front. As a result of its right side so resting in the water, water entered the trailer at least to such depths, wetting or saturating at least that part of the freight, including the aforementioned Bendix cartons, with which it came into direct contact. The trailer was approximately 8 feet high.
5. Plaintiff’s general claim agent, who was located in Memphis, Tennessee, was promptly notified by telephone of the accident and, at about 5 o’clock in the morning, proceeded to the scene of the accident, as did his assistant. Upon arrival, they decided to unload the freight from the trailer before pulling it out of the ditch and uprighting it. The removal of the freight would thus lighten the trailer and facilitate the uprighting operation. However, since it was still before daylight and in order to avoid causing the men engaged in the unloading to work in water during the cold winter and early morning temperature, it was first decided to pull the trailer up the ditch and out of the water. With a so-called “wrecker”, the trailer was then pulled approximately 40 feet up the ditch and out of the water. Thus, the trailer remained in the water approximately 3 hours.
6. Plaintiff dispatched two additional trailers from Memphis to the scene of the accident into which the freight from Trailer V-534 could be loaded. The trailer, still lying on its side, was then unloaded. Freight that appeared to be wet was placed in one trailer while freight appearing to be dry was placed in the other. The two trailers then returned to plaintiff’s terminal in Memphis, where they were unloaded, the freight in the two trailers continuing to be segregated. *20 This still being Saturday, plaintiff’s general claim agent was unable to make contact that day with the shipper, Bendix, to ascertain what disposition should be made of the shipment.
Of the 136 cartons involved in the accident, plaintiff’s employees initially determined that 52 showed water damage while 84 appeared as not having been touched by water. However, plaintiff’s claims agent reported later, in a letter to defendant’s agent dated February 17, 1956, that all 136 of the cartons showed evidence of water damage.
7. (a) On Monday morning, February 13,1956, plaintiff’s general claim agent telephoned the traffic manager of Bendix, advised him of the accident and the damage to the cartons, and inquired about returning the shipment to Bendix. However, the Bendix employee advised plaintiff’s agent that the shipment was moving on a Government bill of lading under which title to the merchandise had passed to the Government, that it therefore could not accept a return of the shipment, and that plaintiff should obtain instructions from the Brookley Air Force Base. During the course of said telephone conversation with the Bendix traffic manager, plaintiff’s claim agent overheard a conversation which he construed constituted an opinion by a Bendix employee, whom he considered to be a qualified engineer, to the effect that contact with fresh water for a short period would not cause corrosion or otherwise harm the brake parts. As a result, plaintiff’s claim agent (who was not an engineer) concluded, erroneously, that no damage had occurred or could occur to the brake parts that were packaged in any of the cartons that had come in contact with the drainage ditch water and that, consequently, plaintiff’s liability as a result of the accident would be an insubstantial one, amounting only to the cost of repackaging the wet cartons.
(b) Thereupon, plaintiff’s claim agent telephoned the Air Force Base and informed its Chief of the Receiving Branch, Transportation Division (to whom plaintiff’s agent was referred and who was authorized to handle such matters) about the accident, the water damage to the cartons, the refusal of Bendix to accept a return of the shipment, his understanding that the brake parts themselves were not damaged by the exposure to the water, and the advice of *21 Bendix that the shipment be forwarded to the Base. Defendant’s official thereupon advised that since the shipment was moving on a Government bill of lading, it would have to come to the Base. Accordingly, he authorized plaintiff’s agent to forward the shipment to the Base. In further discussion as to how the shipment should be handled upon receipt at the Base, defendant’s official stated that defendant would protect the shipment by promptly unloading it and placing it in the receiving warehouse where it could dry out and where it would then be held for plaintiff’s inspection. Plaintiff’s agent concurred in this arrangement, characterizing it as fair, and stated that he would so notify the district manager of plaintiff’s Mobile terminal who could then inspect the shipment at the Base in accordance with this arrangement.
8. It was the general policy and procedure at the Base, with which plaintiff was familiar, that whenever concealed damage was discovered by defendant’s unloaders during the course of unloading a shipment, unloading would be immediately suspended, photographs would be taken, and the carrier promptly notified so that a representative could come to the Base, if he so desired, inspect the shipment, and verify the damage. In this way, the carrier’s agent could assess the damage before there was any further handling of the shipment by defendant’s employees, and could further protect the carrier’s interests by assisting in the supervision of the further unloading and minimizing any damage.
This policy and procedure was not applicable to this shipment because of plaintiff’s specific authorization to defendant to unload the shipment upon arrival. It would not, in any event, even without such specific authorization, be applicable since its primary purpose was to give the carrier prompt notice of concealed damage. In this instance, plaintiff was already apprised of the damage and itself had notified defendant thereof. As stated, it was not unduly concerned about the damage, believing that its costs in connection therewith would be inconsequential, and specifically authorized defendant to proceed with the unloading promptly upon the arrival of the trailer at the Base.
*22 However, had plaintiff requested that this shipment, upon arrival at the Base, not be unloaded until its representatives would arrive and could participate in the supervision thereof, the request would have been granted.
9. (a) On the same day, i.e., Monday, February 13, 1956, plaintiff loaded the Air Force freight on another trailer (No. 337) at its Memphis terminal. The 26 cartons, which were not involved in the accident and which had arrived, in the meantime, at the Memphis terminal aboard another trailer, were placed in the front end and the remaining 136 cartons were loaded in the rear. Separating the two lots was freight for other consignees in Mobile, some of which was also wet. Heavy cardboard sheets of approximately 5 by 6 feet in size were placed between each of the three sections as separators or partitions to aid in preventing any water from the wet rear section from wetting the other freight during the course of transportation. The trailer was dispatched to Mobile Monday night. It was not packed to capacity. The highway distance from Memphis to Mobile is 399 miles and takes approximately 15 hours on a tractor-trailer run.
(b) Transporting wet and dry freight in the same trailer, in the manner hereinabove set forth, is not good practice because of the possibility of water from the wet freight reaching and damaging the dry freight. The cardboard separators between the different lots of merchandise were not sufficient to insulate the dry freight from water damage. During the course of the Memphis-Mobile run, some water ran from the wet cartons in the rear of the trailer onto the floor of the trailer and moved to the dry freight, causing some of the dry freight to become wet. Although the front (nose) of the trailer is ordinarily higher than the rear while moving over the highway, nevertheless the terrain of the Memphis-Mobile run is hilly in certain locations and on the downgrades the water would be thrown forward to the dry freight sections. Stops and starts would also have such an effect. As stated, the cardboard separators between the various lots in the trailer were not watertight, and water could get around them.
Plaintiff’s claim agent had inquired of others in plaintiff’s organization at Memphis about forwarding the wet freight *23 to Mobile in a separate trailer, but those responsible for making such decisions refused to assign a special trailer for the purpose, considering that it would be uneconomical. It was thought that the expense involved of sending out a separate, unfilled, trailer with the wet freight would exceed any expense that might be caused by dry cartons becoming wet, which, as stated, plaintiff considered would be limited, in the case of the Air Force freight, to an inconsequential repackaging cost. Accordingly, both the wet and dry freight were packed in one trailer.
10. On Tuesday, February 14, 1956, plaintiff’s general claim agent in Memphis telephoned the district manager in charge of plaintiff’s terminal in Mobile, advised him of the accident, and informed him that the damaged freight would arrive at the Mobile terminal that day. He told him that he had already informed the Base, and asked him to proceed to the Base, together with plaintiff’s Mobile claim agent, after the shipment was unloaded at the Base, so that they could inspect it, as had been previously arranged with the Base.
11. (a) The trailer arrived at plaintiff’s Mobile terminal on Tuesday, February 14, 1956, where most of the freight for non-Government consignees was removed. The trailer was then sent on to the Base where it arrived at approximately 6:30 p.m. Previous to leaving for the day, the aforesaid [Receiving Branch Chief had advised the Base employee who was the night supervisor in general charge of unloading-commercial trailers that plaintiff was forwarding a truckload of damaged merchandise, of which plaintiff already had knowledge, and instructed him to have it unloaded and placed in the receiving warehouse. At approximately 8 p.m., the trailer was opened for unloading by the night crew and it was immediately apparent to them that the shipment was wet. Water was running out of the rear end of the trailer, and the cartons at the rear were soggy. Thereupon, defendant’s employee (stock handler) at the Base who checked inbound freight and was in initial charge of its unloading advised his superior, who was said night supervisor, of the arrival of a shipment of wet freight, asked him to view it before the unloading commenced, and requested instructions as to how it should be handled. The supervisor *24 stated that he had been advised that a damaged shipment would arrive which he had been instructed to unload. However, after inspecting the trailer and the cartons in the rear and seeing how wet they were, he was hesitant to unload the trailer. The standard procedure at the Base concerning the discovery of damage in a shipment, as described in finding 8, included the taking of photographs of the damaged freight, and he thought it might be well to have the unloading suspended in order to have such pictures taken of this unusual condition. Accordingly, he again discussed the situation with said Beceiving Branch Chief who reiterated, however, that it was admitted damage by plaintiff and that plaintiff had specifically authorized the unloading. Accordingly, he again instructed that the shipment be unloaded and that it be segregrated in the receiving warehouse so that it could be inspected the following morning.
(b) The unloading of the shipment thereupon commenced shortly after 8 p.m. The cartons and boxes in the rear were unloaded first, with the other cartons and boxes being unloaded as they were reached in the trailer. As the cartons and boxes were unloaded, they were placed on pallets, the cartons being stacked 3 high and the boxes 2 high. The pallets with the cartons and boxes were placed in the receiving warehouse for inspection the next morning. At the time of unloading, the boxes and cartons were in a very wet condition. Some of the cardboard cartons were falling apart and water was running out of some of the wooden boxes. Only about a dozen boxes in the front of the trailer appeared to be dry. These were stacked by themselves and were not intermingled with the boxes that appeared to be wet, which was, in any event, the way the dry boxes would have been reached in the normal course of the unloading from rear to front, since plaintiff had, as shown, loaded the wet freight in the rear of the trailer and the dry freight in the front.
(c) The shipment was accompanied by plaintiff’s Freight Bill No. CH-362214, which listed the 162 cartons or boxes making up the shipment. This document was executed by said stock handler at the Base during the evening of February 14, 1956, and served as plaintiff’s delivery receipt. On *25 the reverse side of the consignee’s copy thereof, the stock handler made the following notation:
This shipment was received at Brookley AFB in a very wet condition. Subject to inspection for damage.
A. J. Taylor 2/14/56
12. (a) At approximately 7 a.m. the following morning (Wednesday, February 15, 1956), defendant’s claim officer at the Base inspected the shipment as it was stored in the receiving warehouse. The cartons were still wet, with water dripping from some of them. Water was also on the pallets and the warehouse floor in some places. Thereupon, he called plaintiff’s local claim agent, advised him of the situation, and requested that he come to the Base to inspect the shipment. Said agent, together with plaintiff’s Mobile District Manager, came to the Base immediately. Plaintiff’s claim agent and defendant’s claim officer then made a joint inspection of the cartons. Plaintiff’s Mobile claim agent advised that, since the accident happened in plaintiff’s Memphis area, any reports with respect thereto would be handled by plaintiff’s Memphis claim agent and all that he (the Mobile agent) could do was to acknowledge that the shipment was in a wet condition. Thereupon, below the notation on the consignee’s copy of the freight bill, referred to in finding II (c), plaintiff’s claim agent wrote:
Carrier agent acknowledges above discrepancy.
C. PI. Dixon.
(b) Later that morning, the shipment was further inspected by an official at the Base (the Supply Inspector). He observed that many of the cartons were coming to pieces and water was still dripping from some of them. He opened some of the boxes and saw that water had soaked through and had come into contact with the brake assemblies. Because of the condition of the shipment, the fact that the item is a delicate one, and the importance of eliminating any corrosion and rust from them, he concluded that all of the assemblies should be transferred to the maintenance shop for determination by the officials there in charge as to whether they should be submitted to a func *26 tional test. Tlie shipment was then removed to the maintenance shop for such purpose.
(c) Later that day, plaintiff’s general claim agent in Memphis again telephoned defendant’s Receiving Branch Chief, inquired about the shipment, and asked how much defendant’s official thought the damage would be. Defendant’s official, who in the meantime had also inspected the shipment and the value thereof, advised that in his opinion it would run into thousands of dollars. Plaintiff’s claim agent then stated that in such event he had better come to the Base as soon as possible, and advised he would arrive there the following afternoon.
13. (a) On the morning of the following day, Thursday, February 16, 1956, the shipment was examined in the maintenance shop by defendant’s official at the Base who was in charge of the repair of aircraft parts. He determined that all of the assemblies should be subjected to a functional test which he felt was required, regardless of any corrosion or rust damage, simply by reason of the fact that the shipment had been in an accident. It was necessary to make certain that the automatic adjuster pins on the brakes had not slipped or otherwise moved out of adjustment as a result of any impacting caused by the accident. Furthermore, any brake assembly wherein any rust or corrosion was visible would have to be treated so as to remove any possibility of corrosion or rust on the component parts. Parts of the assembly are composed of magnesium, a metal which is particularly subject to corrosion. For this purpose, the brake would have to be completely disassembled and processed through a chemical cleaning and corrosion treatment system. The existence of corrosion was visible on some of the assemblies in open cartons. However, said official was instructed to delay the commencement of any of these operations until plaintiff’s agent could inspect the shipment. As set forth in finding 12(c), said official was expected to arrive at the Base that afternoon.
(b) In the early part of that afternoon, plaintiff’s general claim agent came to the Base, as arranged the previous day, and, in the company of plaintiff’s local claim agent, defendant’s claim agent and said aircraft repair parts offi *27 cial, inspected tlie shipment. Plaintiff’s agent was advised that all of the cartons would be opened and the brake assemblies tested functionally, and that any assembly showing rust or corrosion would have to be treated, as described above. Plaintiff’s agent questioned the necessity for all this work, since some cartons appeared to be dry at that time. At his suggestion and request, one carton which appeared to be dry (although it contained visible water stains) was opened and the contents did in fact appear to be dry. As a result, plaintiff’s agent urged defendant’s officials not to open up, test, and rust-treat all 162 boxes. He stated that 26 cartons had not been involved in the accident so they could not have been touched by the water in the ditch. At this time, defendant’s claim agent requested plaintiff’s agent to submit a letter to him setting forth the details and circumstances surrounding the accident and the wet freight resulting therefrom.
(c) Later that afternoon, defendant unpacked all 162 cartons in preparation for said tests and treatments.
14. On Friday, February 17, 1956, plaintiff’s claim agent sent to defendant’s agent the letter the latter requested, referred to in finding 13 (b). This letter read as follows:
This has reference to your request for a report of accident to our trailer V-534 carrying your consignment from Bendix Products, South Bend, Indiana and moving on GBL-AF-5879721 our Pro CH-362214.
This is to advise that driver King was forced off of highway 51 approximately 30 miles south of Memphis enroute to Mobile from Chicago. The tractor and trailer stopped in a ditch approximately 30 feet off of the highway. Heavy rains caused water damage and about one-half of the length of the trailer was in 12 inches of water. A wrecker was used to pull the trailer out of the ditch and the freight was transferred into 2 trailers.
The Brookley shipment was returned to Memphis and Bendix Products was called to have the cartons repacked. We were advised by the shipper that the commodity could not be damaged by water. We then contacted your base for disposition.
The wet freight was loaded on trailer 337 with 26 boxes of same dry freight in the nose of trailer and separated by partitions and the 136 cases that showed water damage was loaded in rear of trailer.
*28 Any further information will be gladly furnished.
15. (a) The functional test and repair work on the shipment commenced on February 17, 1956. As set forth in finding 13(c), all the cartons had been unpacked the previous afternoon. Every assembly was visually inspected and a determination made as to the extent of the work to be performed. A functional test was ordered for all of them. Twelve assemblies were deemed in proper condition for the performance of such a test only, with no further work to be performed on them if they passed the test. The balance of the 150 brakes were ordered to be completely disassembled and processed through the chemical cleaning and corrosion treatment system, which included corrosion protection. Thereafter, these tests and treatments were given. Some of the brakes required further processing over brake lathes to machine out excess pitting caused by corrosion. Thirty-six of the assemblies were condemned as being beyond economical repair. However, certain parts of these condemned assemblies had some salvage value.
(b) Defendant thereafter determined that, after crediting plaintiff with the salvage value of the condemned assemblies, it had been damaged in the sum of $9,907.87, representing its loss on the condemned assemblies, and its costs (labor and materials) of repair, repackaging, and preservation of those which could be put into serviceable condition. No charges were assessed on the 12 assemblies upon which only the functional test was performed. On two of the brake assemblies condemned, valued at $407.32 each, or a total of $814.64, plaintiff was credited with a total salvage value of $521.98, making a loss of $292.66. On the other 34, valued at $268.74 each, or a total of $9,137.16, plaintiff was credited with a total salvage value of $7,510.27, making a loss of $1,626.89. Thus, the total loss on the 36 was $1,919.55. Labor and material charges were thus restricted to the balance of the 114 cartons. These charges totaled $8,008.22. This amount, added to the $1,919.55 loss on the condemned assemblies, came to $9,927.77. Against this sum was credited $19.90 as the further scrap value of certain wood and steel, making a net total loss of $9,907.87. Based on the *29 162 cartons involved in the shipment, the average damage would be $61.16 per carton.
(c) As set forth above, the value of one of the types of brake assemblies condemned was $107.32 each. Of the total shipment of 162, there were 108 of these assemblies, making a total value of $43,990.56.
Also as set forth above, the value of the other type of brake assembly condemned was $268.74 each. Of said total shipment, there were 42 of this type, making a total value of $11,287.08.
The balance of the shipment consisted of 12 assemblies valued at $572.57, making a total value thereof of $6,870.84.
Thus, the total value of the entire shipment was $62,148'.48.
16. On September 27, 1956, defendant submitted to plaintiff a claim in the amount of $9,907.87, calculated as set forth above, as being the amount of loss and damage defendant incurred. Thereupon, by letter of October 16, 1956, to the Army’s Transportation Division, Finance Center, Indianapolis, Indiana, plaintiff complained about such charge and requested that the claim against it be reduced to $5,748.52. Plaintiff’s letter was as follows:
This has reference to the damaged consignment moving on Government Bill of Lading AF 5879721, our Pro OH 362214, and consisting of 162 cartons of Bendix Products Company airplane brake shoes or parts.
This is to advise that our Trailer V534 under date of February 11, 1956, on Highway 61 [sic], south of Memphis, Tennessee, was involved in an accident causing the tractor and trailer to depart from the highway and run into a small ditch that is used for drainage along the highway. The left side[7] of the trailer was at an angle m water that reached into the trailer approximately a foot and one half at the rear, on a slant, and angling to about one-half foot of water[8] near the front of the trailer. This trailer was pulled out of the ditch and the load transferred to a new trailer[9] and returned to our Memphis terminal for inspection.
*30 When, the inspection ivas made there were 52 cartons that were involved in the water and 84 cartons in the same trailer that were not touched by water. The 84 cartons were loaded in a separate section of our Trailer 337 at Memphis, Tennessee, with cardboard separators that were approximately 5' x 6' (picture of separators attached), along with 26 cartons that belonged on this same bill of lading that were moving on a part lot and were not involved in the accident whatsoever. The 26 cartons were loaded in the nose of our trailer along with other dry shipments that moved to Mobile, one shipment consisting of Carrier Corporation’s air conditioner units and one large shipment of candy for the Mobile Cigar & Tobacco Company. Directly behind the dry freight that was not involved was loaded the 84 cartons with petitions [sic] and easily recognized separators; and behind the 84 cartons there was a separator of cardboard, and directly behind this separator the 52 cartons that were in the water were loaded on the rear of the trailer at a distance from the dry freight and separated so that the wet freight would not be involved with the dry.
After an inspection was made of the brake shoes, I called Mr. Haas of the Bendix Products Corporation at South Bend, and we were advised that we would have to contact Brookley as the title of this consignment was in their name. Also, at this time we were advised that the brakes were built to specification to withstand any climatic conditions and could not be damaged by water if salt-free. After this information was received, we contacted Mr. Vanden Bosch of Brookley Air Force Base, Mobile; and it was agreed that we should bring the damaged merchandise to the Brookley Air Force Base for inspection. It is an agreement with the Brook-ley Air Force Base that any damaged merchandise received at the Base will not be removed from the trailer until our Claim Department or Mr. McKay is called in for an inspection.
The following Monday morning at 8:00 A.M., the appointed time, our Mr. McKay and Mr. Dixon reported to the Base for inspection of this truck and learned that the damaged freight was unloaded prior to their arrival. In this truck there were approximately 10,000 pounds of domestic freight to be delivered to the various commercial accounts in Mobile proper. It appears that your unloading crew had a slack period; and it is my understanding that our trailer was unloaded Sunday, Febru *31 ary 14, or before the day shift Monday morning,[10] and the carrier was not notified for inspection.
Sometime after we did inspect the brake shoes, we learned that the 162 cartons were not separated as we had separated them on our trailer and that some of the wet cartons were stacked on top of the dry cartons. We made this inspection with your Mr. Ledlow of the Transportation Department and Mr. Simpson of the Engineering Department. I personally picked out several of the dry cartons after we were told that the 162 were wet, and inspection was made in the presence of Mr. Ledlow and Mr. Simpson. It was an established fact and acknowledged by Mr. Ledlow and Mr. Simpson in the presence of the writer and our Mobile agent, Mr. J. P. McKay, that several of the cartons on the bottom of the stack were in a dry condition.
We feel that since 26 of the cartons were not involved in the accident there should be no charges whatsoever for the inspection, packing, running of functional tests, and other charges that have been assessed against the carrier. Further, we feel that the 84 cartons that were not damaged by water also should not have been run through a functional test, having same dehydrated and placed in a container, with the cost of this expense being billed against the carrier. However, we do feel that we are liable for the 52 wet cartons, which have been inspected; and it is my understanding that 34 of the 52 were in a damaged condition and that salvage would be allowed our company. We are satisfied with the salvage allowance estimated by Mr. Ledlow.
We feel that this claim should be pro-rated due to the fact that Brookley Deceiving Department did add further damage to this consignment by placing wet cartons on top of dry ones, and further, that we were not called in to make this inspection before the truck was unloaded, as outlined by Brookley Air Force Base’s Mr. Melville[11] of the Transportation Department. We feel that the cost involved, that has amounted to over $9,000, should be pro-rated and that we should have some relief on the cost of the 110 that were inspected and charges made against the carrier where we feel that this should not have been billed against our line.
*32 The following is a breakdown as to acknowledged Wet Cartons, Involved But Not Wet, and Cartons Not Involved Whatsoever in the Accident:

Wet Involved Not Invol/oed

52 84 26
$3,179.80[12] $5,137.44 $1,590.16
OYEBALL AYEEAGE 61.16
Condemned
34 @ 1,646.89 (Average— $47.85)[13]
2 @ 292.66 (Average — $146.33)
36
Inspected — Dehydrated—Functional—Bepair—Eepack
(Average — $12.62) (Average — $4.67)
(shock strut) 12 @ Labor $151.38 Material $56.10 (Brake Assy.)
70M-C-1 (Average — $13.90) (Average — $53.50)
$407.32 94 @ Labor $1,306.87 Material $55,029.56 (Brake Assy.)
62 EFM-C (Average — $12.15) (Average — $107.85)[14]
$268.74 8 @ Labor $97.21 Material $1,367.10
TOTAL $9,907.87 (162)
We ask total relief in the Not Involved Cartons in the amount of $1,590.16, fifty per cent relief in the 84 cases Involved in the amount of $2,568.72 and acknowledged liability on the 52 cases Wet — our total acknowledged liability amounting to $5,748.52.[15]
We have appeared before the Brookley Air Force Base Survey Board and do not know of any relief or evidence as to proven carrier liability submitted with this claim as a result of this Survey Board meeting.
We ask that this claim be reduced from $9,907.87 to $5,748.52.
On December 20, 1956, plaintiff, in a further effort to settle the matter, forwarded to defendant a certified check in said amount of $5,748.52, together with a letter again outlining its position, and requested that the check be accepted in full satisfaction of the claim. By letter of April 16, *33 1958, defendant advised plaintiff that its offer to compromise the claim, as set forth in plaintiff’s letter of December 20, 1956, had been rejected, and since plaintiff’s check had previously been deposited in the United States Treasury, the amount thereof would be refunded. Said refund was subsequently made. Demand was made upon plaintiff for the full amount of $9,907.87. Upon plaintiff’s refusal to pay this amount, defendant, in July 1958, deducted said sum from other funds due plaintiff. The petition herein was filed on September 16, 1958.
17. Plaintiff does not contest the reasonableness of the charges herein involved. It contends, as set forth in its letter of October 16, 1956 (finding 16) that defendant was partly responsible for the large number of wet cartons and assemblies because, in unloading the trailer at the Base, it carelessly mixed wet and dry cartons, causing dry cartons to become wet. It claims that only 52 cartons became wet as a result of the accident, and that these cartons were carefully segregated in the trailer that brought them to the Air Base. It contends that it had an understanding with the Base, based on the telephone conversation its general claim agent had with defendant’s Chief of the Receiving Branch at the Base (referred to in finding 7), that the trailer would not be unloaded until plaintiff’s representatives could come to the Base and supervise the unloading, so as to make certain that the wet cartons would not be intermingled with the dry. It argues that but for the violation of this agreement, and the negligent unloading and intermingling by defendant’s unloaders, charges with respect to no more than 52 cartons would be properly chargeable against it. The parties are in agreement that plaintiff’s liability should be measured on the basis of $61.16 per carton with respect to any cartons erroneously charged against it. (Finding 15(b).) On this basis, plaintiff now admits liability only in the amount of $3,180.32 (52 X $61.16).
The record does not support plaintiff’s contentions. As shown, 136 cartons incurred water damage either as a result of the accident or as a result of the transportation of wet cartons and dry cartons together in the same trailer from Memphis to Mobile. While plaintiff did segregate those *34 cartons it considered to be dry from those it considered to be wet in sending them on to Mobile, it was not good practice to transport wet and dry freight in the same trailer in situations where it is important to maintain the dry freight in a dry condition. It is reasonable to assume that approximately one-half of the 26 dry cartons which were not involved in the accident, and any of the 136 cartons which did not become wet at the time of the accident, became wet during the Memphis-Mobile run. This would leave only approximately 12 dry cartons by the time the shipment arrived at the Base, which conforms to the proof as to the condition of the shipment when it was unloaded. Plaintiff was not in fact charged with any amount on 12 assemblies, which defendant concluded were dry and required no repair work. This also conforms to the above analysis. The charges totaling $9,907.87 against plaintiff with respect to the remaining 150 assemblies, as set forth in finding 15, were reasonable and properly assessed. The processing of the wet assemblies and the protective measures defendant took with respect thereto were, considering the delicacy of the aircraft parts involved and their importance in relation to the proper functioning of the aircraft and the dependence of the lives of the crew and passengers thereon, reasonably and properly accomplished.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Plaintiff attempted to explain its failure to offer any record in corroboration of its contention that 26 cartons came to Memphis later as a part lot shipment by saying that part lot records are sometimes destroyed by its agents after the part lots are consolidated, as was the case here when the lots were consolidated in Memphis on the Monday following the accident. If so, this was indeed a most negligent destruction in this instance. The accident had already occurred and it would seem that all records pertaining thereto, and especially the records showing what was on the trailer at the time of the accident, certainly should have been retained.

 Plaintiff says that with the trailer, which was 8 feet high and fully loaded, resting in less than 2 feet of water, it was not possible for any great amount of freight to have become wet. However, this does not take into account greater water damage which may have occurred from the splash caused by the first impact of the trailer and the water, the fact that the water in the trailer may have risen above the height of the water in the ditch by reason of its being forced upward in confined areaB in the truck as it lay in the ditch for approximately 3 hours, and the possibility of a further spread of water within the trailer during the operation of pulling it from the ditch prior to unloading.

 Plaintiff also asks the court to disregard the 136 figure In Its letter of February 17 on the grounds that plaintiff’s agent was in a hurry when he wrote it in Mobile and had no files or records in his possession at the time, which were all in the home office at Memphis. However, what files or records were in existence at the time with respect to the number of cartons that suffered water damage, other than the road manifest, was never explained. None were presented at the trial. And certainly, if the letter was erroneous because written in a hurry and without office records, it could have been corrected easily as soon as the agent returned to his Memphis office.
In this connection, plaintiff also says that the fact that there were 52 wet cartons and 84 dry ones in the overturned trailer is supported by a document called a “loading plan” prepared when it reloaded the freight on the new trailer at Memphis. Plaintiff says that the scheme of loading hereinabove described was set forth on the “loading plan” which was sent along with the trailer. However, this “loading plan” was similarly never produced. Plaintiff says that it too must have been destroyed.

 Plaintiff contends the 136 marks on the road manifest had reference only to the total number of cartons on the overturned trailer, which plaintiff was counting during the unloading to make certain no freight was lost as a result of the accident. However, there is no indication that the nature of the accident was such as to have resulted in any possibility of any lost freight. Furthermore, the similar count marks on the manifest with respect to other non-Government freight do not, on plaintiff’s own admission, match the amount of such freight which plaintiff concedes was on the trailer. It seems clear, therefore, that the marks in fact indicate the amount of freight that was water damaged, since the number thereof coincides with the figure in the letter.

 As set forth in footnote 3, the “loading plan” which purportedly showed the claimed arrangement of loading was never produced. Defendant’s un-loaders testified they saw no such cardboard sheets as plaintiff described. As noted, the trailer had first stopped in Mobile at plaintiff’s terminal, where it underwent some unloading operations.

 However, had plaintiff specifically requested that the shipment not be unloaded until its agents could come to the Base and supervise the unloading, such request would have been granted.

 At the trial plaintiff's witness testified it was the right Side of the trailer that was in the water.

 At the trial plaintiff’s witness estimated the height of the water at the front as up to 12 inches.

 Plaintiff’s testimony at the trial was that the load was transferred to two new trailers, one containing the dry freight and the other the wet.

 This is erroneous. Sunday was February 12. The record shows that the trailer was unloaded on Tuesday, February 14.

 This reference is obviously to Mr. Raymond M. Neville, Deputy Chief of the Transportation Division at the Base.

 This figure is erroneous. The correct figure is $3,180.32.

 This figure is erroneous. The correct figure is $48.44.

 This figure is erroneous. The correct figure is $170.89.

 This figure is erroneous. The correct figure is $5,749.04.